[No. B155143. Second Dist., Div. Eight. June 12, 2003.]

CENTRAL AND WEST BASIN WATER REPLENISHMENT DISTRICT, Plaintiff and Respondent, v.
SOUTHERN CALIFORNIA WATER COMPANY et al., Defendants and Appellants.

892

## COUNSEL

Hatch & Parent, Robert J. Saperstein and Russell M. McGlothlin for Defendants and Appellants.

Rockard J. Delgadillo, City Attorney, Richard M. Helgeson and Edward Schlotman, Assistant City Attorneys, and Julie A. Conboy, Deputy City Attorney, for City of Los Angeles, acting by and through the Los Angeles Department of Water and Power as Amici Curiae on behalf of Defendants and Appellants.

Weston, Benshoof, Rochefort, Rubalcava & Maccuish, Edward J. Casey and Paeter E. Garcia for Plaintiff and Respondent.

Lemieux & O'Neill and Steven P. O'Neill for Central Basin Municipal Water District as Amicus Curiae on behalf of Plaintiff and Respondent.

Nossaman, Guthner, Knox & Elliott, Frederic A. Fudacz and Alfred E. Smith for Upper Los Angeles River Area Watermaster and Main San Gabriel Basin Watermaster as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**COOPER, P. J.**—This appeal presents two principal issues: who has the right to utilize unused storage space in the Central Basin, a groundwater basin, and who has the right to manage the subsurface storage space.[1] These issues arise in the context of a motion that sought to allocate all of the usable

---

[1]Groundwater "means nonsaline water beneath the surface of the ground, whether or not flowing through known and definite channels." (Wat. Code, § 60015.) Groundwater basin is "loosely" defined as "an area containing a groundwater reservoir capable of furnishing a

storage space to the 148 public entities and private persons with the adjudicated right to extract water from the basin. The trial court denied the motion. It concluded that the unused storage space is a public resource, and that the Water Replenishment District of Southern California (WRD) is authorized to manage it. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Parties

Appellants—the Cities of Long Beach, Downey, Lakewood, Signal Hill, Santa Fe Springs, Pico Rivera, and Paramount, Southern California Water Company, California Water Service Company, Montebello Land and Water Company, South Montebello Irrigation District, and Tract 349 Mutual Water Company—are several of the entities with the adjudicated right to extract water from the Central Basin. Appellants describe themselves as "provid[ing] potable water services to more than one million businesses and residents in western Los Angeles County." According to appellants, collectively they control about 50 percent of the total permissible annual pumping allocation from the Central Basin.

Respondent WRD was formed in accordance with and is governed by legislation. (Wat. Code,[2] § 60000 et seq.) The five members of WRD's board are elected and serve staggered four-year terms. (§§ 60080 et seq., 60135 et seq.) With the exception of powers related to groundwater contaminants, WRD's power may be exercised only for replenishment purposes. (§§ 60221, 60224, 60230.) Appellants and the other entities with the right to pump water from the Central Basin are charged an assessment to finance WRD's activities. (§ 60317.)

### Conjunctive Use

In appellants' view, the core issue in this case is the pressing need for expanded conjunctive use of the Central Basin. Conjunctive use describes a management technique which involves the coordinated use of both surface water and groundwater resources. (Todd, Groundwater Hydrology, *supra*, p.

---

substantial water supply." (Todd, Groundwater Hydrology (John Wiley & Sons 2d ed. 1980) p. 47.) The amount of storage space in a groundwater basin depends on the subsurface geological formations and the amount of vacant space between the soil particles. (Foley-Gannon, *Institutional Arrangements for Conjunctive Water Management in California and Analysis of Legal Reform Alternatives* (2000) 6 Hastings W.-N.W. J. Envtl. L. & Pol'y 273, 278-279.)

[2]All further statutory citations are to the Water Code.

371.) It is the method currently favored by the Legislature (§ 1011.5) and supported by all parties to this litigation. Benefits of conjunctive use include conservation, reduction in surface storage facilities, and storage of water for periods of draught.[3] (State of California Department of Water Resources Bulletin No. 118, California's Groundwater (1975) p. 14.)

In lieu and artificial recharge are two types of conjunctive use projects. In lieu projects involve using surface water in lieu of pumping water from a basin. (Association of Groundwater Agencies, A Guide to Conjunctive Use in Southern California (2000) pp. 6-7.) Artificial recharge requires forcing surface water into available storage space in an underground basin through percolation ponds or injection wells. (*Id.* at p. 8.)

In WRD's view, it already implements conjunctive use projects and litigation is not necessary to further develop the storage space in the Central Basin. WRD boasts of having restored over 250,000 acre-feet of water to the Central Basin.

*The Central Basin*

The Central Basin extends approximately 277 square miles, underneath mostly urban or suburban land. (State of California Department of Water Resources (Oct. 2000) WaterMaster Service in the Central Basin, p. 9.) Currently, 148 entities, including Appellants, have the right to extract water from the Central Basin (collectively Pumpers or Water Rights Holders). These entities include cities, municipalities, water companies, school districts, individuals, family trusts, landowners, businesses, religious institutions, cemeteries, nurseries, country clubs, and golf courses.

On January 2, 1962, WRD's predecessor, the Central and West Basin Water Replenishment District, filed a complaint against over 500 parties for adjudication of water rights and injunctive relief. It was alleged that each defendant extracted water from the Central Basin and that collectively defendants took too much water. According to the complaint, if the extractions continued at their then current rate, the groundwater level would be lowered, deeper wells would be necessary, and the Central Basin would be flooded with sea water. The principal relief requested was "[t]hat each Defendant who establishes the right to produce ground waters from the

---

[3]For a detailed discussion of conjunctive use projects see Foley-Gannon, *Institutional Arrangements for Conjunctive Water Management in California and Analysis of Legal Reform Alternatives, supra*, 6 Hastings W.-N.W. J. Envtl. L. & Pol'y 273; Robie and Donovan, *Water Management of the Future: A Groundwater Storage Program for the California State Water Project* (1979) 11 Pacific L.J. 41, 44-4.

Central Basin be permanently enjoined from extracting annually ground waters from the Central Basin in an amount exceeding that quantity of water in acre feet determined by applying its pro-rata percentage of all the rights to produce groundwater in the Central Basin as determined by this Court, to the safe yield of the said basin as determined by this Court . . . ."[4] No relief was requested with respect to the use of the storage space in the Central Basin.

The court entered the parties' stipulated agreement as its judgment. The inter se adjudication awarded water rights to 508 parties (which have since been consolidated in 148 entities). Each party's annual pumping allocation was described and each party was enjoined from overpumping absent specified conditions.

The judgment created a "carryover right" as follows: "In order to add flexibility to the judgment and assist in the physical solution to the problems of Central Basin, each party adjudged to have a Total Water Right or water rights and who, during a particular water year, does not extract from Central Basin a total quantity equal to such party's Allowed Pumping Allocation for the particular water year, less any allocated subscription by such party for purchase of Exchange Pool . . . is permitted to carry over from such water year the right to extract from Central Basin in the next succeeding water year so much of said total quantity as it did not extract in the particular water year, not to exceed ten (10% percent of such party's Allowed Pumping Allocation, or ten acre feet, whichever of said ten percent or ten acre feet is the larger)."

The numerous findings of facts listed in the judgment include two related to the storage of water. First, "[g]roundwater extractions from Central Basin are, and at all times have been affected by common problems of storage, replenishment, quality and supply among all persons extracting groundwater therefrom." Second, the court found that extraction of 80 percent of a party's water right would "permit economical utilization of the Central Basin and its preservation as a storage and reservoir facility."

The court appointed a watermaster to assist the court in the administration and enforcement of the judgment. The watermaster's duties included implementing measures to assure compliance with the judgment and preparing an annual report for the court.

---

[4] " 'Safe yield' " is defined as " 'the maximum quantity of water which can be withdrawn annually from a ground water supply under a given set of conditions without causing an undesirable result[,]' " i.e., a gradual lowering of the groundwater levels. *(City of Los Angeles v. City of San Fernando* (1975) 14 Cal.3d 199, 278 [123 Cal.Rptr. 1, 537 P.2d 1250].)

The court reserved jurisdiction and amended the judgment twice. The second amendment modified the carryover provision to permit Pumpers to carry over 20 percent of their allocated pumping allowance from year to year. The second amended judgment (Judgment), the operative judgment, reserves continuing jurisdiction unto the court "[t]o provide for such other matters as are not contemplated by the judgment and which might occur in the future and which if not provided for would defeat any or all of the purposes of this judgment to assure a balanced Central Basin subject to the requirements of Central Basin Area for water required for its needs, growth and development."

*Appellants' Motion*

Based on the reserved jurisdiction, on August 22, 2001, appellants moved to amend the Judgment to "more fully quantify[] and allocat[e] the rights of adjudicated water rights holders to use underground storage space in the Central Basin" (Motion). Appellants estimated that approximately 645,700 acre-feet[5] of storage space is available in the Central Basin.

The Motion proposed a single allocation of the unused storage space: the division of the total usable storage space among the 148 Pumpers in direct proportion to each extractor's annual pumping allocation. Under the terms of the Motion, "[e]ach Pumper would be allocated the right to use a portion of the total available unused storage space in the Basin in direct proportion to that Pumper's *pro rata* share of the total water rights in the Basin." "[I]f a Pumper holds 5% of the rights to extract water from the Basin, that Pumper would also hold 5% of the available storage space in the Basin." Appellants argued that they were entitled to full use of the "available storage because they collectively are entitled to all of its groundwater. . . ."

The amended judgment as proposed by appellants included the following three provisions:

1. "Through the Restated Judgment, each Party is granted an expanded right to Store Water in the Basin through an Allowed Storage Allocation . . . . The Allowed Storage Allocation is quantified based on each Party's right to Extract Water from the Basin (their Total Water Right). Watermaster is authorized to regulate the use of the allowed Storage Allocation." The following formula was proposed: "Allowed Storage Allocation = (Party's Total Water Right)/(Sum of all Parties' Total Water Right) *Total allowed Storage Allocation."

---

[5]An acre-foot is the amount of water that covers an acre of land one foot deep. An acre-foot is enough water to supply one or two households for one year.

2. "The Parties [the 148 entities with the right to pump water] collectively shall have the right to use the Total Storage Space for reasonable and beneficial purposes, subject to the terms and conditions of this Restated Judgment." The "Total Storage Space" is defined as "the maximum amount of available space in the Basin . . . in which Water could be Stored or placed in Carryover for subsequent reasonable and beneficial uses . . . ."

3. "Allowed Storage Allocation, Carryover Credits, and Stored Water Credits can be assigned, licensed, or leased individually and separately from a Party's Allowed Pumping Allocation. However, all Allowed Storage Allocation, Carryover Credits, and Stored Water Credits associated with any quantity of Allowed Pumping Allocation shall accompany and be transferred at the same time as a sale of that quantity of Allowed Pumping Allocation. If a Party only sells a portion of an Allowed Pumping Allocation, that Party shall retain the Allowed Storage Allocation, Carryover Credits, or Stored Water Credits only in the amount associated with the amount of Allowed Pumping Allocation retained."

*WRD's Opposition to the Motion*

WRD opposed the Motion, arguing that the trial court lacked jurisdiction. WRD maintained that storage is separate and distinct from extraction. WRD also argued that the proposed allocation interfered with its statutory powers and that the unused storage space is a public resource.

*The Watermaster Neither Supports nor Opposes the Motion*

The Motion proposed alterations to the powers of the watermaster, increasing the watermaster's responsibilities to include "regulat[ion]" of the storage space to ensure that "(1) the Allowed Storage Allocation is exercised consistently with the terms and the intent of the Restated Judgment, (2) Central Basin water quality is protected, and (3) the Extraction and Storage rights of the Parties are not impaired."

The current watermaster—the Southern District of the California Department of Water Resources[6]—indicated that it "neither supports nor opposes the merits of the Motion." In a declaration, Charles White, the Chief of the Southern District of the Department of Water Resources, declared that "The Department supports expansion of 'conjunctive use' of groundwater and surface supplies as a cost-effective and environmentally favorable means of improving water supply reliability."

---

[6] The Department of Water Resources is a state agency vested with authority over water matters. (See §§ 120 et seq., 225 et seq.)

*Trial Court's Findings*

In denying the Motion, the trial court found that the Judgment was limited to the right to pump water from the basin and the right to pump is a "totally different issue" from the right to put water in the basin. The court further concluded that the "right to use subsurface space to store imported water in a groundwater basin is separate and distinct right from the right to exercise an adjudicated groundwater right." The court also determined that WRD "has the statutory authority to replenish and store waters for conjunctive use management." Appellants timely appealed.

## CONTENTIONS

Appellants contend that the Judgment reserves jurisdiction to consider the allocation of storage rights in the Central Basin. Their principal argument is that the Motion proposed a practical plan to utilize more effectively the unused underground storage space and that the Pumpers are the most appropriate entities to benefit from conjunctively using the space. For legal support, appellants rely on the doctrine of mutual prescription and on the carryover right described in the Judgment. Finally, appellants vigorously dispute WRD's asserted managerial authority.

WRD challenges the court's jurisdiction. In the alternative, WRD argues that the Pumpers do not possess the subsurface storage space and cannot privatize the public resource. WRD also claims that several provisions proposed in the Motion interfere with its statutory powers.

The City of Los Angeles, the Central Basin Municipal Water District, the Upper Los Angeles River Watermaster, and the Main San Gabriel Watermaster filed amici curiae briefs with this court. We consider the arguments raised by the amici curiae to the extent those arguments are urged by either party or integrally intertwined with the issues raised by the parties. However, we do not consider the issues raised by the amici curiae that were not advanced by the parties. (*California Assn. for Safety Education v. Brown* (1994) 30 Cal.App.4th 1264, 1274 [36 Cal.Rptr.2d 404] ["It is a general rule that an amicus curiae accepts a case as he or she finds it."].)

## DISCUSSION

First, we consider jurisdiction, the threshold issue. Second, we summarize applicable California water law. Then we discuss appellants' claims that they collectively possess the storage space under the doctrine of mutual prescription and under the Judgment. We also consider the relevant policies

advanced by appellants. Finally, in the last section, we discuss the scope of WRD's authority as it pertains to the Motion.

## I. *Jurisdiction*

Courts regularly affirm the expansive retention of jurisdiction in cases involving water rights. (*City of Pasadena v. City of Alhambra* (1949) 33 Cal.2d 908, 937 [207 P.2d 17]; *City of L. A. v. City of Glendale* (1943) 23 Cal.2d 68, 81 [142 P.2d 289].) "The retention of jurisdiction to meet future problems is regarded as an appropriate exercise of equitable jurisdiction in litigation over water rights, particularly when the adjustment of substantial public interests is involved." (*City of L. A. v. City of Glendale, supra,* 23 Cal.2d at p. 81.) That is exactly what happened here; the Judgment reserved jurisdiction to meet future problems and adapt to changed circumstances.

Specifically, the court reserved jurisdiction "[t]o provide for such other matters as are not contemplated by the judgment and which might occur in the future, and which if not provided for would defeat any or all of the purposes of this judgment to assure a balanced Central Basin subject to the requirements of Central Basin Area for water required for its needs growth and development." The allocation of storage space falls within this broad provision. The parties agree that the development of the unused storage space will facilitate conservation and improve the reliability of the water supply for the region. Even WRD acknowledges that several Pumpers "have a need for water that exceeds the level of their 'Allowed Pumping Allocation.'" Conservation of water and reliability of the water supply are a matters of significant public interest and are of "transcendent importance." (*Gin S. Chow v. City of Santa Barbara* (1933) 217 Cal. 673, 702 [22 P.2d 5].)

The broad retention of jurisdiction in the Judgment differs substantially from the limited retention of jurisdiction considered in *Big Bear Mun. Water Dist. v. Bear Valley Mutual Water Co.* (1989) 207 Cal.App.3d 363 [254 Cal.Rptr. 757] and relied on by WRD. In *Big Bear Mun. Water Dist. v. Bear Valley Mutual Water Co.,* the trial court interpreted a provision limiting continuing jurisdiction to the "interpretation, enforcement or carrying out this Judgment." (*Id.* at p. 370, italics omitted.) The trial court found that the language excluded any modification of the terms of the judgment. (*Id.* at p. 374.) Whereas the Judgment in the present case retained expansive jurisdiction to provide for matters not contemplated by the court, the judgment in *Big Bear Mun. Water Dist.* retained limited jurisdiction only to interpret, enforce, or carry out the judgment. Because the language of the two provisions are entirely different, *Big Bear Mun. Water Dist.* is inapposite.

██ The retention of jurisdiction here does not contravene the well-established rule that a court cannot adjudicate future water rights. (*City of Pasadena v. City of Alhambra supra*, 33 Cal.2d at p. 937; *Orange County Water District v. City of Colton (*1964) 226 Cal.App.2d 642, 648-649 [38 Cal.Rptr. 286].) Under this rule, even though the prospective reasonable beneficial uses of an overlying owner are protected, the specific quantity of water necessary for prospective uses cannot be determined until the need arises. (*Tulare Dist. v. Lindsay-Strathmore Dist.* (1935) 3 Cal.2d 489, 525 [45 P.2d 972].) ██ This rule is inapplicable here because the allocation of storage space requires "no declaration as to future rights in water [or storage space] to which a party has no present right." (*City of Pasadena v. City of Alhambra supra*, 33 Cal.2d at p. 937.)[7] Jurisdiction over the Motion is proper.

## II. *Water Rights Under California Law*

To place appellants' Motion in proper context, we summarize the governing law.

### A. *The Storage Space in the Central Basin Is a Public Resource*

██ The California Constitution mandates the use of all water resources in a manner consistent with the interest of the people.[8] Article X, section 2 (formerly article XIV, section 3) requires that: "the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such water is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare."

The purpose of the constitutional amendment was to ensure that the state's water resources would be "available for the constantly increasing needs of all of its people." (*Meridian, Ltd. v. San Francisco* (1939) 13 Cal.2d 424, 449 [90 P.2d 537].) This broad constitutional provision encompasses "the use of all of the water within the state." (*Modesto Properties Co. v. State Water*

---

[7]Appellants also rely on a provision in the court's reservation of power enabling the court to adjust the "permissible level of extractions from Central Basin in relation to achieving a balanced basin and an economic utilization of Central Basin for groundwater storage . . . ." This reservation of jurisdiction, however, relates specifically to determining the level of extractions, not the storage allocation.

[8]The parties agree that the unused storage space in the Central Basin is a public resource. Ignoring the general rule that amici curiae must take the case as they find it, several amici curiae vigorously disagree. Because the amici curiae's argument is intertwined with the issues raised by the parties, we consider the issue on the merits.

*Rights Board* (1960) 179 Cal.App.2d 856, 860 [4 Cal.Rptr. 226].) It is applicable to the "settlement of all water controversies" (*Miller & Lux v. San Joaquin L. & P. Corp.* (1937) 8 Cal.2d 427, 435 [65 P.2d 1289]), and to surface storage. (*Meridian, Ltd. v. San Francisco, supra,* 13 Cal.2d at pp. 449-450.) Subsurface storage, which is akin to a natural reservoir (*City of Los Angeles v. City of Glendale, supra,* 23 Cal.2d at p. 76), also falls within this broad provision.

The same policy described in California Constitution, article X, section 2—that water resources must be used in the public interest—is expressed in several statutes. (§§ 100,[9] 105.[10]) Most significantly, under section 105, underground water resources must be developed "for the greatest public benefit." In short, the parties' statement that the subsurface storage space is a public resource is amply supported by the Constitution and Water Code.

### B. *The Right to Water Is Usufructuary*

■ At least since 1928 when the predecessor to article X section 2 of the California Constitution was adopted, there is no private ownership of groundwater. (*State of California v. Superior Court* (2000) 78 Cal.App.4th 1019, 1023, 1025 [93 Cal.Rptr.2d 276].) The State of California owns all of the groundwater in California, not as a proprietary owner, but in a manner that empowers it to supervise and regulate water use. (*Id.* at pp. 1022, 1026.) Water rights holders have the right to "take and use water," but they do not own the water and cannot waste it. (*Id.* at p. 1025.)

■ A person obtains a right to extract groundwater by owning specific land, by appropriating water (*City of Pasadena v. City of Alhambra* (1949) 33 Cal.2d 908, 925 [207 P.2d 17] (*City of Pasadena*)), or by inheriting a pueblo right. (*Pleasant Valley Canal Co. v. Borror* (1998) 61 Cal.App.4th 742, 751 [72 Cal.Rptr.2d 1].) Ownership of land appurtenant to groundwater engenders an "overlying right." (*City of Pasadena, supra,* 33 Cal.2d at p. 925.)

---

[9]That statute provides: "because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such water is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or watercourse in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water."

[10]That statute provides: "It is hereby declared that the protection of the public interest in the development of the water resources of the State is of vital concern to the people of the State and that the State shall determine in what way the water of the State, both surface and underground, should be developed for the greatest public benefit."

Under the "correlative rights doctrine," "as between the owners of land overlying strata of percolating waters, the rights of each to the water are limited, in correlation with those of others, to his 'reasonable use' thereof when the water is insufficient to meet the needs of all. [Citations.]" (*Niles Sand & Gravel Co. v. Alameda County Water Dist.* (1974) 37 Cal.App.3d 924, 934 [112 Cal.Rptr. 846].) An appropriative right is based on the taking of groundwater. (*Ibid.*) Pueblo rights apply to municipal successors to Mexican and Spanish pueblos. (*Pleasant Valley Canal Co. v. Borror, supra,* 61 Cal.App.4th at p. 751.)

Where an appropriation of water is wrongful, open, notorious, continuous for the statutory period of five years, hostile, and adverse it may mature into a prescriptive right. (*City of Pasadena, supra,* 33 Cal.2d at pp. 925-926.) Like other water rights, prescriptive rights are "artificial creatures of the law." (*Orange County Water Dist. v. City of Colton, supra,* 226 Cal.App.2d at p. 646.) "To perfect a claim based upon prescription there must, of course, be conduct which constitutes an actual invasion of the former owner's rights so as to entitle him to bring an action." (*City of Pasadena, supra,* 33 Cal.2d at p. 927.) The scope of a prescriptive right depends on what was obtained in an open, notorious, continuous manner. (Cf. *Connolly v. McDermott* (1984) 162 Cal.App.3d 973, 977 [208 Cal.Rptr. 796] [considering a prescriptive easement].)

### C. *Mutual Prescription*

*City of Pasadena, supra,* 33 Cal.2d 908, developed the later-named doctrine of mutual prescription. Similar to the 1965 adjudication in this case, *City of Pasadena* involved litigation to determine how much water each extractor could pump from a basin without further exacerbating a developing overdraft.[11] (*City of Pasadena,* at p. 916.) All but one party, the California-Michigan Land and Water Company, stipulated to a judgment that included the following critical stipulation: " 'all of the water taken by each of the parties to this stipulation and agreement, at the time it was taken, was taken openly, notoriously and under a claim of right, which claim of right was continuously and uninterruptedly asserted by it to be and was adverse to any and all claims of each and all of the other parties joining herein.' " (*Id.* at p. 922.)

---

[11]An accumulated overdraft is the aggregate amount of groundwater removed from a basin which exceeds the quantity of nonsaline water replaced in the groundwater basin. (See § 60023 [defining accumulated overdraft in a basin governed by WRD].) Annual overdraft is the amount of groundwater removed in a given water year that exceeds the supply of nonsaline water replaced therein. (Cf. § 60022 [defining annual overdraft in a basin governed by WRD].)

Focusing on the fact that, even though the entities continued to extract water from the basin, some water remained in the basin, the California-Michigan Land and Water Company argued that there was no injury, an element of prescription. (*City of Pasadena, supra*, 33 Cal.2d at p. 928.) The court rejected the argument, reasoning that "[t]he pumping by each group . . . actually interfered with the other group in that it produced an overdraft which would operate to make it impossible for all to continue at the same rate in the future." (*Id.* at p. 931.) Although the parties could have continued extracting water from the basin, the continued pumping interfered with the future ability to extract water and accordingly, satisfied the invasion element of prescription. (*Id.* at p. 932.) The Supreme Court applied the principle of mutual interference to bind all of the basin's pumpers.

After finding mutual interference, the court considered which entities were required to reduce their extractions. With little analysis, the court concluded that a proportional reduction was more equitable than an elimination of certain uses of water. (*City of Pasadena, supra*, 33 Cal.2d at p. 933.) "A *pro tanto* reduction of the amount of water devoted to each present use would normally be less disruptive than total elimination of some of the uses." (*Ibid.*) Thus, the court upheld a proportional allocation, wherein each party had the right to use some amount of water from the basin in proportion to that party's prescriptive right.

The use of a proportional apportionment to allocate extraction rights subsequently was limited in *City of Los Angeles v. City of San Fernando* (1975) 14 Cal.3d 199 [123 Cal.Rptr. 1, 537 P.2d 1250] (*City of San Fernando*).) *In City of San Fernando*, the high court questioned "mechanically" allocating water and found that such allocation "does not necessarily result in the most equitable apportionment of water according to need. A true equitable apportionment would take into account many more factors." (*City of San Fernando, supra*, 14 Cal.3d at p. 265.) The court never enumerated the "many more factors," but, in a footnote, cited *Nebraska v. Wyoming* (1945) 325 U.S. 589, 618 [65 S.Ct. 1332, 1351, 89 L.Ed. 1815], which, in the context of a water dispute among states, listed the following factors as illustrative: "physical and climatic conditions, the consumptive use of water in the several sections of the river, the character and rate of return flows, the extent of established uses, the availability of storage water, the practical effect of wasteful uses on downstream areas, the damage to upstream areas as compared to the benefits to downstream areas if a limitation is imposed on the former . . . ." (*City of San Fernando, supra*, 14 Cal.3d at pp. 265-266, fn. 61.)

*City of San Fernando* involved, among other things, a dispute whether the City of Los Angeles could recapture water it imported and stored in a

groundwater basin even though the water was not specifically traceable. (*City of San Fernando, supra,* 14 Cal.3d at pp. 255-256.) The court upheld the right of the city to recharge artificially the basin and to recapture the water it imported. (*Id.* at p. 264.) "The purpose of giving the right to recapture returns from delivered imported water priority over overlying rights and rights based on appropriations of the native ground supply is to credit the importer with the fruits of his expenditures and endeavors in bringing into the basin water that would not otherwise be there." (*Id.* at p. 261.) However, the court declined to consider any further allocation of storage rights, because "there [did] not appear to be any shortage of underground storage space in relation to the demand therefor." (*Id.* at p. 264.) The *City of San Fernando* court relied on *City of L. A. v. City of Glendale* (1943) 23 Cal.2d 68, 76 [142 P.2d 289], where the City of Los Angeles's right to use the water it stored in the San Fernando Valley was upheld.

More recently, the Supreme Court harmonized *City of Pasadena* and *City of San Fernando.* "*City of San Fernando* distinguished *City of Pasadena, supra,* 33 Cal.2d 908, where a 'restriction to safe yield on a strict priority basis might have deprived parties who had been using substantial quantities of ground water for many years of all further access to such water.' [Citation.]" (*City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1246-1247 [99 Cal.Rptr.2d 294, 5 P.3d 853].) "Case law simply does not support applying an equitable apportionment to water use claims unless all claimants have correlative rights; for example, when parties establish mutual prescription. Otherwise, cases like *City of San Fernando* require that courts making water allocations adequately consider and reflect the priority of water rights in the basin." (*City of Barstow, supra,* 23 Cal.4th at p. 1248.)

### III. *Mutual Prescription Does Not Apply to the Storage Space*

Relying on *City of Pasadena, supra,* 33 Cal.2d 908, 931-933, appellants argue the Pumpers' right to the total unused storage space was created by the doctrine of mutual prescription. According to appellants, "[t]he proposed proportional allocation of storage rights would follow the same format set forth in the 'mutual prescription' doctrine by providing equal priority shares of the total allocated storage in proportion to each party's existing allocation of production and carryover rights. Accordingly the proposal is a legally sound, equitable, and rational method to allocate rights to store water among the parties."

We disagree with appellants' statement for two reasons: (1) there is no evidence that the Pumpers satisfied the elements of mutual prescription; and

(2) the mechanical equitable apportionment used in *City of Pasadena* is not applicable here.

### A. *Mutual Prescription*

The doctrine of mutual prescription applies only if the *use* of the claimed right was actual, open, notorious, hostile and adverse to the original owner and continuous for the statutory period. (*City of Barstow v. Mojave Water Agency, supra*, 23 Cal.4th at p. 12451.) Appellants bear the burden of establishing each element, and have failed to demonstrate any one. (*Pleasant Valley Canal Co. v. Borror, supra,* 61 Cal.App.4th 742, 784.) The Motion concerned *unused* property that by definition was not continuously *used* in an open, notorious, and hostile manner.

Appellants do not argue that they appropriated water for storage. Nor do appellants argue that they appropriated storage space for water by physically storing water in the Central Basin (putting aside the carryover right to which we shall return). Without appropriation, there is no prescriptive right. (See *Tehachapi-Cummings County Water Dist. v. Armstrong* (1975) 49 Cal.App.3d 992, 1000 [122 Cal.Rptr. 918].) Without prescription, there is no mutual prescription.

### B. *Equitable Apportionment*

In *City of Pasadena*, the court affirmed a proportional allocation to avoid the elimination of any present use. (*City of Pasadena, supra,* 33 Cal.2d at p. 933.) The circumstances in this case warrant no similar concern because the Motion involved only unused storage space, which by definition does not tread upon current uses. Appellants assume that a proportional allocation is necessarily equitable, the "mechanical" assumption criticized in *City of San Fernando* and held inapplicable in *City of Barstow* unless the parties rights are either correlative or based on mutual prescription, doctrines that do not apply here. (See also *Hi-Desert County Water Dist. v. Blue Skies Country Club, Inc.* (1994) 23 Cal.App.4th 1723, 1734, fn. 11 [28 Cal.Rptr.2d 909].)

Appellants claim that "the right to use storage space [is] an element of their water rights." If that were correct, it would follow that a prescriptive right to water necessarily encompasses a right to storage. However, appellants' water rights are based on prescription, which in turn, is based on and limited to the property actually used. (Cf. *Connolly v. McDermott, supra,* 162 Cal.App.3d at p. 977 [considering a prescriptive easement].) Appellants' prescriptive interest is in "the use of the water, not in the storage space." (*In re Application U-2 Central Nebraska Public Power and Irrigation District* (1987) 226 Neb. 594, 610 [413 N.W.2d 290].)

## IV. *The Judgment Does Not Grant Appellants a Storage Right*

Appellants rely on the Judgment and judgments from other basins to argue that they collectively have the right to all of the unused storage space. Specifically, appellants argue that (1) storage of water is linked to extraction, a right already given to the Pumpers under the Judgment; (2) their carryover right is tantamount to a storage right; and (3) judgments in other basins correctly award storage rights to the entities authorized to extract water from those basins. As we shall explain, even assuming the correctness of appellants' predicate facts, the conclusion they seek—possession of all of the unused storage space—does not follow.

### A. *Linkage of Storage and Extraction Rights*

■  Appellants argue that the proportional allocation is appropriate because storage and extraction are hydrologically linked, a contention supported by the record, case law, and also advanced by the amici curiae.[12] Appellants, however, cite no law that generally holds that a legal interest in one right results in an interest in all "linked" rights, or that more specifically holds that the right to store water attaches to the right to extract water from a groundwater basin. If appellants' theory were correct, adjacent property owners would have more control over their neighbors than nuisance law affords them, easement owners would have more control over the dominant tenement than property law affords them, and end water users would have more control over water extraction than water law affords them. (See, e.g., *Gdowski v. Louie* (2000) 84 Cal.App.4th 1395, 1408 [101 Cal.Rptr.2d 609]; *Scruby v. Vintage Grapevine, Inc.* (1995) 37 Cal.App.4th 697, 702-703 [43 Cal.Rptr.2d 810]; *State of California v. Superior Court, supra*, 78 Cal.App.4th at p. 1026.) Extraction and storage are different physical processes; establishing a hydrologic link between them is not sufficient to show that a legal interest in one creates an interest in the other. (Indeed, it is undisputed that while WRD has authority to store water, it has no authority to extract water.)

In a related claim, appellants argue that "[a]s a practical matter" they are best positioned to use the storage space because they already possess wells.

---

[12]For example, it is the extraction of water from the basin that creates the storage space. A furlough of extraction augments the supply of water in storage. The cost to appellants of extraction is also linked to the amount of water in storage because the cost of pumping water depends on the distance the water must be lifted. Storage capacity is a component of determining the safe yield, which in turn influences the permissible level of extraction. (*Allen v. California Water and Tel. Co.* (1946) 29 Cal.2d 466, 475 [176 P.2d 8].) In addition, the quality of extracted groundwater is affected by the quality of water stored in a groundwater basin. (Foley-Gannon, *Institutional Arrangements for Conjunctive Water Management in California and Analysis of Legal Reform Alternatives, supra*, 6 Hastings W.-N.W. J. Envtl. L. & Pol'y at p. 280.)

According to appellants, it is "logical" to grant them the right to use the storage space because they are the only entities who can extract water from the Central Basin. Appellants appeal to "common sense," arguing that common sense requires "groundwater production be managed in a coordinated fashion along with the use of storage space . . . ."

Appellants' reliance on common sense and practicalities is unpersuasive as indications of existing legal rights. Justice Mosk's concern that " 'common-sense' is in the eye, or mind, of the beholder" (*Commercial Life Ins. Co. v. Superior Court* (1988) 47 Cal.3d 473, 485 [253 Cal.Rptr. 682, 764 P.2d 1059] (dis. opn. Mosk, J.)) is heightened where, as here, appellants' claim is that common sense supports a legal right for which there is no legal authority. Although courts have applied "common sense" in interpreting the meaning of a statute (see *id.* at pp. 477-485), appellants cite no cases where courts have relied only on "common sense" or practicalities to award water or property rights.

### B. *Carryover Rights*

The carryover provision permits the Pumpers to carryover a limited amount of their allotted water right and store it for a fixed period of time. According to the watermaster, "[t]his flexibility was necessary to meet unforeseen emergencies in water demand." Appellants emphasize the carryover provision, identifying it as a carryover storage provision and underscoring the physical result of carrying over water: "[u]npumped groundwater that is 'carried over' occupies physical 'storage' space in the Basin." Appellants estimate that if all Pumpers exercised their carryover right 45,000 acre-feet of storage would be used.

To the extent appellants are arguing their right to use 45,000 acre-feet of storage space results in the right to use all of the storage space, that argument suffers from the same problems as their "linked" argument. One right does not automatically engender another even if they are interrelated. Pumpers' limited right to carryover their annual pumping allocation, assuming it is aptly characterized as a storage right, does not confer a greater right to utilize storage space in addition to that granted in the carryover provision.

Appellants may be understood to argue that the carryover provision facilitates in lieu conjunctive use of the Central Basin. They assert that "[m]odern conjunctive use practices are built upon 'in lieu' storage, which is made possible by carryover." Appellants further state (with no support) that "[i]n-lieu storage is likely to be the most efficient and economic means of storing water in the Central Basin because it relies on existing water

distribution infrastructure . . . ." At most, appellants have shown that increasing the amount of water that can be carried over from year to year might create incentives for the Water Rights Holders to purchase surface water in lieu of pumping from the Central Basin. However, the Motion sought to allocate all of the unused storage space, not merely to increase the Pumpers' carryover rights.

### C. *Judgments in Other Basins*

Finally, appellants and several amici curiae describe and emphasize the allocations of storage space developed and implemented in other California groundwater basins. The trial court judgments from other basins are irrelevant to the issues in this case. The judgments are not persuasive or binding authority.

■ "It is the policy of the law to discourage litigation and to favor compromise and voluntary settlements of doubtful rights and controversies, made either in or out of court." (*Central Basin etc. Wat. Dist. v. Fossette* (1965) 235 Cal.App.2d 689, 705 [45 Cal.Rptr. 651].) Parties may agree to a solution that " 'waives or alters their water rights in a manner which they believe to be in their best interest.' " (*City of Barstow v. Mojave Water Agency, supra*, 23 Cal.4th 1224, 1239 [quoting and approving Court of Appeal observation].) The agreements reached by parties in other basins are not helpful to understanding the rights of the parties in the Central Basin within existing legal frameworks.

### V. *The Proportional Allocation Aspect of the Storage Motion Does Not Guarantee Beneficial Use*

■ In their Motion, appellants advanced a single proposed allocation: each Pumper would be entitled to a pro rata share of the total usable storage space in proportion to the Pumper's allocated right to extract water in a manner where the storage space rights could be freely transferred. Appellants explain that "[a] market for Basin water rights currently exists in which Water Right Holders can sell or lease rights that exceed their present demand. [Citation.] Similarly, those that possess storage allocation in excess of their needs could sell or lease their surplus. Thus, each entity that has historically relied on the Basin would receive benefit from the use of Central Basin's storage space, while simultaneously ensuring that the resource is used by those entities that value it most."

Appellants' proposal fails to ensure that the storage space will be used for the public benefit. The proportional allocation ignores the priorities of water

use set by the Legislature, which declare that the use of water for domestic purposes as the highest and the use for irrigation as the second priority. (§ 106; see also *Prather v. Hoberg* (1944) 24 Cal.2d 549, 562 [150 P.2d 405] ["Without question the authorities approve the use of water for domestic purposes as first entitled to preference."].) Further, appellants' proposal ensures only that the Water Rights Holders would benefit from the exploitation of the storage space, either by using it or by selling it to the highest bidder. As Appellants conclude, under their proposal, "each entity that has historically relied on the Basin would receive benefit from the use of Central Basin's storage space. . ." The Constitution requires that the public benefit as well by mandating that the use of water resources be consistent with the interest of the people and for the public welfare.

Appellants recognize the constitutional mandate and argue that granting the Motion is consistent with the constitutional mandate because the proportional allocation would result in public accountability and would lead to greater efficiency. We discuss the claims separately.

### A. *Public Accountability*

Relying on one consultant's statement, appellants argue that the Pumpers are directly accountable to the "consumers who put Central Basin water to beneficial use." Similarly, in its amicus curiae brief, the City of Los Angeles argues that municipalities are directly accountable to the public. There is some support for the claim that municipalities are well positioned to respond to the future needs of their residents as the City of Los Angeles argues. (*Baldwin v. County of Tehama* (1994) 31 Cal.App.4th 166, 178 [36 Cal.Rptr.2d 886]; § 106.5.[13]) However, the proposed proportional allocation applies regardless of whether the Water Right Holder is accountable to the public and therefore provides no safeguard for the public. In addition, the Motion permits the Pumpers to sell their storage rights to "those entities that value it most" without any guarantee that the "entities that value it most" also are accountable to the public.

### B. *Efficiency*

In developing public resources for the greatest public benefit, efficiency is one relevant factor. (§ 109, subd. (a) ["The Legislature hereby

---

[13]Section 106.5 provides: "It is hereby declared to be the established policy of this State that the right of a municipality to acquire and hold rights to the use of water should be protected to the fullest extent necessary for existing and future uses, but that no municipality shall acquire or hold any right to waste water, or to use water for other than municipal purposes, or to prevent the appropriation and application of water in excess of its reasonable and existing needs to useful purposes by others subject to the rights of the municipality to apply such water to municipal uses as and when necessity therefore exists."

finds and declares that the growing water needs of the state require the use of water in an efficient manner and that the efficient use of water requires certainty in the definition of property rights to the use of water and transferability of such rights."].) Efficiency is not, however, synonymous with reasonable or beneficial use; "the most efficient use of water [resources] is not necessarily its most beneficial or reasonable use." (*Big Bear Mun. Water Dist. v. Bear Valley Mutual Water Co., supra,* 207 Cal.App.3d 363, 378.) ▮▮▮ To be consistent with the constitutional mandate, the use of storage space must be exercised "with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare." (Cal. Const., art. X, § 2.) Even assuming appellants' have demonstrated their proposal would result in greater efficiency, a statement based only on the opinion of appellants' consultant,[14] that is not enough to satisfy the constitutional mandate. (*Big Bear Mun. Water Dist. v. Bear Valley Mutual Water Co., supra,* 207 Cal.App.3d 363, 378.)

Embedded within appellants' efficiency claim is a request for clearly defined water rights, a prerequisite for an efficient market. The request for definition is understandable in light of the deleterious effects of uncertainty. "Initially, [uncertainty] inhibits long range planning and investment for the development and use of waters in a stream system. . . . [¶] Uncertainty also fosters recurrent, costly and piecemeal litigation." (*In re Waters of Long Valley Creek Stream System* (1979) 25 Cal.3d 339, 355 [158 Cal.Rptr. 350, 599 P.2d 656].) The need for clear definition, however, supports no particular allocation including that proposed by appellants.

VI.   *WRD Is Authorized to Manage the Storage Space in the Central Basin*

▮▮▮ For reasons we shall explain, WRD has authority to store water for conjunctive use and has authority to manage the storage space in the Central Basin.

---

[14]Appellants rely on the opinion of Rodney Smith, the president of a water supply development company and the senior vice-president of a consulting firm, who states that allocating storage rights to the Pumpers will promote the marketability of water rights, reduce transaction costs, and foster cooperative development. Transaction costs "are the aggregate costs incurred as part of the transfer process that can be apportioned to buyers, sellers, state or local agencies and institutions, and third parties." (Kaiser, *Texas Water Marketing In The Next Millennium: A Conceptual and Legal Analysis* (1996) 27 Tex. Tech L.Rev. 181, 211.)

For a discussion of marketing water rights compare Gregory, *Groundwater and Its Future: Competing Interests and Burgeoning Markets* (1992) 11 Stan. Envtl. L.J. 229, 248-252 with Crammond *Leasing Water Rights for Instream Flow Uses: A Survey of Water Transfer Policy, Practices, and Problems in the Pacific Northwest* (1996) 26 Envtl. L. 225, 246-255; see also Bloomquist et al., *Institutions and Conjunctive Water Management Among Three Western States* (2001) 41 Nat. Resources J. 653.)

WRD is expressly authorized to store water for the purpose of replenishing the district.[15] (§ 60221, subd. (e).) Storing water for replenishment purposes is similar to storing water for conjunctive use. The Judgment defines " 'Artificial Replenishment' [as] the replenishment of Central Basin achieved through the spreading of imported or reclaimed water for percolation thereof into Central Basin by a governmental agency." This form of artificial replenishment involves forcing surface water into underground basins by artificial recharge. Artificial recharge conjunctive use projects involve forcing surface water into available storage space in an underground basin through percolation ponds or injection wells for the coordinate use of surface and groundwater. Thus, WRD's authorization to store water for replenishment purposes includes authority to store water for conjunctive use projects.

The Legislature also granted WRD authority to "manage and control water for the beneficial use of persons or property within the district." (§ 60221, subd. (e).) This broad power necessarily encompasses management of at least some portion of the storage space because the water WRD is authorized to manage and control is located in the basin's storage space. The plain meaning of the statute governs where the language is unambiguous. (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].) Here, the plain language of the statute grants WRD management authority.

The Legislature also authorized WRD to manage in-lieu replenishment projects when it expressly permitted WRD to "fix the terms and conditions of any contract under which producers may agree voluntarily to use replenishment water from a nontributary source in lieu of groundwater, and to that end a district may become a party to the contract and pay from district funds that portion of the cost of the replenishment waters as will encourage the purchase and use of that water in lieu of pumping so long as the persons or property within the district are directly or indirectly benefited by the resulting replenishment." (§ 60230, subd. (p).) The record suggests that WRD exercises this authority to engage in in-lieu replenishment projects similar to those yearned for by appellants. According to the watermaster's October

---

[15]The WRD enabling legislation does not expressly define the term "replenish." In the context of groundwater, the term "replenish" has specialized meanings: (1) "spreading water over a permeable area for the purpose of allowing it to percolate to groundwater basins or aquifers, or otherwise adding water to groundwater basins or aquifers" (West's Ann. Wat. Code Appen. §§ 121-322, 131-322, and 137-316) or (2) "spreading water over a permeable area for the purpose of allowing it to percolate to the groundwater basin, or otherwise adding water to the groundwater basin which without such effort would not augment the groundwater supply." (West's Ann. Wat. Code Appen. §§ 119-317, 124-315, 128-317, 129-317, 135-317.)

2000 report, "[d]uring the 1965-1966 water year, WRD began a program of in-lieu replenishment. . . . [¶] The program may be used to: alter pumping patterns within a groundwater basin; replenish areas of low transmissivity where conventional recharge techniques are ineffective; heighten the effect of injecting water to form a sea water barrier by reducing extractions in the vicinity; reduce the amount of replenishment water purchased by WRD; and reduce the annual extraction from a groundwater basin . . . ."

WRD's power is not unlimited. WRD conceded at oral argument that the Water Rights Holders have an interest in the natural replenishment and an interest to ensure that any imported water does not harm the basin. In addition, as appellants point out, section 60230, subdivision (f) prohibits WRD from duplicating operations of other agencies, suggesting that WRD's authority is not exclusive, an issue we need not further resolve in the context of this case.

In challenging WRD's authority, appellants argue that because WRD is required, on an annual basis, to evaluate the basin and decide what quantity of water to purchase for replenishment purposes, (§ 60315, subd. (a)), WRD's authority is limited to replenishing the annual overdraft. Appellants' reasoning makes no sense in light of the fact that the same statute that requires WRD to make findings with respect to the annual overdraft also requires WRD to make findings with respect to the accumulated overdraft (§ 60315, subd. (d)). There is no support for appellants' claim that the findings WRD is required to make are coextensive with WRD's powers.

Finally, appellants argue that, under section 60051, WRD's interest is subordinate to their own. Section 60051 provides: "No language or provision in this division shall be interpreted or construed so as to limit, abridge or otherwise affect the water or water rights of any existing agency or person or affect the rights of existing agencies or persons with respect to any legal proceeding pending on May 1, 1955, wherein any water or water right or the protection thereof is involved; provided, however, that nothing in this section shall be construed to limit the provisions of subdivision (7) of Section 60230 of this division." Appellants have not shown that the finding that WRD has authority to manage the storage space "limit[s], abridge[s] or otherwise affect[s] the water or water rights of any existing agency or person . . . ." As explained above, appellants do not have the rights, which they now claim are abridged, and therefore section 60051 does not assist them.[16]

---

[16]The parties and amici curiae vigorously dispute the applicability of *Niles Sand and Gravel Co., Inc. v. Alameda County Water Dist., supra,* 37 Cal.App.3d 924. We do not find that case

## CONCLUSION

The Motion is the genesis of this case and establishes the framework for the parties' arguments and our review. Our holding is limited to sole allocation proposed by appellants in the trial court—an allocation of the total usable storage space to the Pumpers, with each Pumper entitled to a share proportional to his, her, or its allocated water right. WRD does not argue, and we do not hold, that the Pumpers are precluded from using the Central Basin storage space. We hold only that appellants' right to extract water from the Central Basin does not create a concomitant right to store water in the Central Basin.

## DISPOSITION

The judgment is affirmed. Each party to bear its own costs on appeal.

Rubin, J., and Boland, J., concurred.

A petition for a rehearing was denied July 9, 2003, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied August 27, 2003. Kennard, J., Baxter, J., and Werdegar, J., did not participate therein.

---

to assist in the construction of WRD's authority because it considered the role of a water district organized pursuant to section 30000, the County Water District Law. (*Niles Sand and Gravel Co., Inc.,* at pp. 929, fn. 5, 937.)