Filed 4/18/25  Chino Basin Municipal Water District v. City of Ontario CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| CHINO BASIN MUNICIPAL WATER DISTRICT,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CITY OF ONTARIO,<br><br>    Defendant and Appellant;<br><br>CUCAMONGA VALLEY WATER DISTRICT, et al.,<br><br>    Defendants and Respondents. | E080457, E082127<br><br>(Super.Ct.No. RCVRS51010)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Gilbert G. Ochoa,

Judge.  Reversed and remanded with directions.

Stoel Rives LLP, Elizabeth P. Ewens, Michael B. Brown and Whitney Brown, for

Defendant and Appellant, City of Ontario.

Brownstein Hyatt Farber Schreck, LLP, Scott S. Slater, Bradley J Herrema and

Laura K. Yraceburu, for Plaintiff and Respondent, Chino Basin Watermaster.

1

Lagerlof, LLP and Thomas S. Bunn III, for Defendants and Respondents, Fontana Water Company and Cucamonga Valley Water District.

JC Law Firm, Jean Cihigoyenetche and J. Martin Cihigoyenetche, for Defendant and Respondent Inland Empire Utilities Agency.

A 1978 stipulated judgment (Judgment) governs the water rights in the Chino Groundwater Basin (Basin) by establishing the Basin's governance structure, providing judicial oversight via continuing jurisdiction provisions, and creating the Chino Basin Watermaster (Watermaster).  To achieve full utilization of the Basin's resources, Watermaster adopted, and the superior court approved, a long-term management program, one element of which instituted an objective and strategy to develop storage and recovery programs for the broad regional benefit of the parties to the Judgment.  One such program—Dry Year Yield Program (DYY Program)—stores extra groundwater during wet years and then recovers the water during dry years.  To finance its actions, Watermaster establishes an annual budget and assesses parties to the Judgment based on their groundwater production.

In this consolidated appeal, one party to the Judgment, the City of Ontario (Ontario), challenges Watermaster's fiscal year (FY) 2021/2022 and 2022/2023 assessments on the grounds Watermaster failed to levy assessments on the groundwater voluntarily produced as part of the DYY Program based upon its erroneous interpretation and application of the 2019 Letter Agreement that amended the agreement that governs the DYY Program.  The superior court, inter alia, found Ontario's challenge to be an untimely and improper objection to the 2019 Letter Agreement—entered into between

2

Three Valleys Municipal Water District (TVMWD),[1] Watermaster, Metropolitan Water District of Southern California (Metropolitan), and Inland Empire Utilities Agency (IEUA)—and further held that stored and supplemental water (from the DYY Program or other storage programs) are exempt from Watermaster assessment.

On appeal, Ontario requests reversal of the superior court's orders and remand with instructions to (1) direct Watermaster to implement the DYY Program in a manner consistent with the Judgment and prior court orders, (2) correct and amend the FY 2021/2022 and 2022/2023 Assessment Packages to assess water produced from the DYY Program, and (3) invalidate the 2019 Letter Agreement and direct Watermaster to comply with the process provided for in the Judgment and subsequent court orders when approving material changes to the DYY Program.

We conclude the superior court erred in finding Ontario's challenges to be untimely and in affirming Watermaster's interpretation of the 2019 Letter Agreement. We therefore reverse.

## I. PROCEDURAL BACKGROUND AND FACTS

*A. The Judgment, Pools, and Watermaster.*

In 1975, Chino Basin Municipal Water District (later known as IEUA) initiated this action against several parties to adjudicate their rights and obligations with respect to groundwater in the Basin, one of the largest groundwater basins in Southern California, providing water to millions of residents in San Bernardino, Riverside, and Los Angeles

---

[1] Referred to in the Judgment as Pomona Valley Municipal Water District.

Counties. Three years later, the parties stipulated to the Judgment, which created a water management plan for the Basin—the Optimum Basin Management Program—by, among other things, setting a safe yield (maximum extraction amount) for the Basin; establishing three stakeholder groups or "pools"—the Overlying Agricultural Pool (Ag Pool), Overlying Non-Agricultural Pool (Non-Ag Pool), and Appropriative Pool (Ap Pool)— each with its own safe yield, rights, and restrictions; and allowing the superior court to retain and exercise jurisdiction via the appointment of Watermaster, an arm of the court. (*Dow v. Honey Lake Valley Resource Conservation Dist.* (2021) 63 Cal.App.5th 901, 911 [observing that Watermaster is "'considered an arm of the Court'"].) As an arm of the court, Watermaster administers and enforces the Judgment and any subsequent instructions or orders of the superior court.

The Pools are responsible for costs of replenishment water and other aspects of the physical solution. Each Pool has a committee that administers its internal affairs, employs its own separate counsel, may seek judicial review of any Watermaster action or failure to act, and—along with an Advisory Committee—provides advice and assistance to Watermaster on the administration of the Judgment. Ontario is a member of the Ap Pool. Watermaster, a nine-member board, is comprised of representatives of parties to the Judgment, including representatives from each Pool. It "administer[s] and enforce[s] the provisions of this Judgment and any subsequent instructions or orders of the [c]ourt," keeps records of water use and ownership, oversees and approves water transfers, monitors groundwater levels, determines the operating safe yield for each year,

4

and assesses the Pools for its expenses.  However, the court retains "[f]ull jurisdiction, power and authority . . . as to all matters contained" in the Judgment.

*B.  The Basin's Safe Yield*

The Judgment identifies the Basin's safe yield, namely, the amount of water that can be withdrawn annually without harming or depleting the Basin.[2]  The safe yield defines the parties' various rights to Basin groundwater.  Parties are prohibited from producing groundwater except as provided in the Judgment, specifically "pursuant to the provisions of the Physical Solution or a storage water agreement."  Also, a party's individual groundwater production establishes the party's portion/assessment of Basin costs.  The Judgment set the initial safe yield at 140,000 acre-feet (AF) per year; however, in 2017, the superior court reset it to 135,000 AF per year.

*C.  The Basin's Groundwater Storage.*

The Judgment acknowledges the Basin's "substantial amount of available groundwater storage capacity" for "storage and conjunctive use of supplemental water

_____

[2] "'Safe yield' means the long-term average annual quantity of groundwater (excluding Replenishment Water or Stored Water but including return flow to the Basin from use of Replenishment or Stored Water) which can be Produced [(pumped or extracted groundwater)] from the Basin under cultural conditions of a particular year without causing an undesirable result."  "The phrase 'undesirable result' is understood to refer to a gradual lowering of the groundwater levels resulting eventually in depletion of the supply."  (*City of Los Angeles v. City of San Fernando* (1975) 14 Cal.3d 199, 278 [safe yield is "'the maximum quantity of water which can be withdrawn annually from a groundwater supply under a given set of conditions without causing an undesirable result'"], disapproved on other grounds in *City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1247-1248.)

with Basin Waters."[3]  Conjunctive use is the planned use of surface water and groundwater resources (either immediately using or storing) to provide a buffer against drought.  Stored water is defined as "supplemental water held in storage, as a result of direct spreading, in lieu delivery, or otherwise, for subsequent withdrawal" and is not included in the Basin's safe yield.  Supplemental water includes "both water imported to Chino Basin from outside Chino Basin Watershed, and reclaimed water," which in turn is defined as water "which, as a result of processing of waste water, is suitable for a controlled use."  The Judgment expressly enjoins the unauthorized storage and withdrawal of supplemental water other than pursuant to an agreement with Watermaster; it compels the adoption of uniformly applicable rules and a standard form of agreement for storage of supplemental water; however, storage agreements "shall by their terms preclude operations which will have a substantial adverse impact on other producers."

D.  *The Optimum Basin Management Program.*

At the superior court's direction, Watermaster prepared the Basin's management program—the Optimum Basin Management Program (OBMP)—to address groundwater quantity and quality issues and regulate withdrawals.  The OBMP was divided into two phases:  Phase I (the report) was adopted in 1999, and Phase II (implementation plan) was approved by the court in 2000.  The OBMP was subject to intensive settlement negotiations that led to various parties to the Judgment executing the Peace Agreement in June 2000 to resolve their disputes regarding "a number of matters pertaining to the

---

[3]  It is estimated that the Basin has an unused storage capacity of about one million AF.

6

power and authority of the Court and Watermaster under the Judgment, . . ." It addresses implementation of the OBMP and allows Watermaster to administer transfers, recharge, and storage/recovery of water. The Peace Agreement, amended in 2004 and 2007, prohibits the approval of a water storage and recovery project "if it . . . will cause any Material Physical Injury to any party to the Judgment or the Basin."

The OBMP's implementation plan defines the Operational Storage Capacity of the Basin at approximately 5,300,000 AF of water and introduces the concept of Safe Storage ("'an estimate of the maximum storage in the Basin that will *not* cause significant water quality and high groundwater related problems'") and Safe Storage Capacity (quantified at about 500,000 AF). Subsurface storage space in a groundwater basin is a public resource, which must be put to beneficial use under Article X, section 2 of the California Constitution. (*Central and West Basin Water Replenishment Dist. v. Southern Cal. Water Co.* (2003) 109 Cal.App.4th 891, 905.)

*E. Annual Assessments.*

Watermaster levies and collects assessments based on each party's water production during the prior year, namely the annual quantity of groundwater[4] pumped or extracted from the Basin. Thus, each year Watermaster staff prepare an assessment

---

**4** The Judgment's definition of groundwater does not distinguish between the "type" of groundwater or how that water made its way into the Basin. Groundwater is defined as water "beneath the surface of the ground and within the zone of saturation, i.e., below the existing water table."

package detailing the accounting of each party's production and use of Basin water.[5]

Each party's assessment is determined by dividing the total of the fixed costs of operating the Basin by the total annual production of all parties; this calculation yields a dollar amount per acre feet of water. Under the Watermaster Rules and Regulations, uniform assessment of production is mandatory. Given fixed costs, a decrease in the total annual production results in an increase in the unit cost.

*F. Groundwater Storage Program Funding Agreement and Dry Year Yield Program.*

In 2000, Metropolitan received $45 million in general obligation bonds for groundwater storage projects within its service area. IEUA and TVMWD are member agencies of Metropolitan. Metropolitan has had storage agreements with IEUA and Watermaster since 1979. In 2003, Metropolitan, IEUA, TVMWD, and Watermaster entered into a Groundwater Storage Program Funding Agreement (Funding Agreement), which was approved by the superior court. The Funding Agreement was subsequently amended to make adjustments to improve and clarify measurement of storage and extraction, to clarify how performance of calls will be evaluated, and to revise administrative milestones and make miscellaneous updates.

In 2004, Watermaster, IEUA, and TVMWD entered into the Storage and Recovery Program Storage Agreement (Storage and Recovery Agreement), which specified the

---

[5] The term Basin water is defined as groundwater within the Basin that is part of the Safe Yield, Operating Safe Yield, or replenishment water in the Basin as a result of operations under the Physical Solution decreed in the Judgment. The "term does not include Stored Water."

8

permissible quantity of water that could be stored under the DYY Program.[6] The 2004 court order approving this agreement emphasized that the DYY Program will "provide[] broad mutual benefits to the parties to the Judgment" but prohibited Watermaster from approving any annual operating plan that "will have a substantial adverse impact on other producers." The order acknowledged the Judgment's provision that "no use shall be made of the storage capacity of Chino Basin except pursuant to written agreement with Watermaster," approved by "'written order of the Court,'" and found the Storage and Recovery Agreement was "unlikely to have any adverse impacts on a party to the Judgment."

The DYY Program authorized Metropolitan (1) to store up to 100,000 AF of imported water in the Basin,[7] subject to higher amounts if approved in advance by Watermaster, and (2) to require (or "call") participating agencies (including IEUA and TVMWD) to produce (pump) 33,000 AF of stored water rather than using the same amount of surface water. The details of how participating agencies would pump stored

---

[6] The DYY Program "allows participating members ('Operating Agencies') of two wholesale agencies [IEUA] and [TVMWD] to withdraw [the] water" stored by Metropolitan. The Operating Agencies include Chino, Chino Hills, Ontario, Pomona, Upland, Cucamonga Valley Water District (CVWD), Jurupa Community Services District, and Monte Vista Water District, all of which are parties to the Judgment and retail water purveyors within the IEUA and the TVMWD service areas. These agencies, including IEUA and TVMWD, executed local agency agreements whereby they would use facilities owned or controlled by them to implement the DYY Program. The Fontana Water Company (FWC) negotiated with IEUA but did not opt-in as a participating agency.

[7] This amount is within the presumptive safe harbor of the Safe Storage Capacity given the fact that Watermaster held approximately 226,797 of the 500,000 AF maximum.

water, including specific performance criteria regarding reductions in imported water deliveries, were provided for in Exhibit G attached to the Funding Agreement. Exhibit G was initially entitled "Chino Basin Conjunctive Use 'Dry Year' Storage Project Performance Criteria." Because IEUA and TVMWD are not local water producers, Exhibit G's performance criteria, which include both groundwater and imported water criteria, are placed on their member agencies to perform. The imported water criteria require a roll-off from imported water supplies and onto groundwater production from the DYY Program. Thus, a program agency claims DYY credit that is equal to its shift off of imported water and onto DYY Program groundwater.

The DYY Program is administered by a five-member Operating Committee, comprised of two representatives from Metropolitan and three representatives chosen by IEUA, TVMWD, and Watermaster. The Operating Committee is delegated with the authority to prepare the Annual Operating Plan which provides an estimated schedule and location for all storage and extraction under the DYY Program and in conformance with Exhibit G on a monthly basis for the upcoming fiscal year. According to the Storage and Recovery Agreement, the Annual Operating Plan must "provide sufficient information to allow the Operating Committee and Watermaster to assess [the program's] potential impacts."

The DYY Program "allow[s] for rational regional water supply planning by allowing for increased imports to the Chino Basin during wet years, and reduced imports during dry years." In exchange for the right to store up to 25,000 AF per year in the Basin (provided the total amount does not exceed 100,000 AF maximum unless approved

10

by Watermaster), Metropolitan invested $27.5 million in local infrastructure and makes annual payments ($177,430 for FY 2021/22) to Watermaster for administration of the DYY Program. Otherwise, the costs associated with the DYY Program, including financing the maintenance and operation of its facilities and Watermaster staff administration time, are passed on to the participating entities. DYY Program costs are distinct from assessment fees charged for production of groundwater from the Basin.

The Funding Agreement and the Storage and Recovery Agreement were adopted through the required process as defined in the Judgment/Peace Agreement, after notice and consideration by the pool committees, the advisory committee, and Watermaster, and approval by superior court order. By its order, the court recognized that any local agency agreements necessary for the DYY Program must be implemented by Watermaster and approved by the court. Thus, IEUA, TVMWD, and their member agencies executed written local agency agreements (Local Agency Agreement) to govern performance obligations under the DYY Program. (See fn. 6.)

Subsequently, the Funding Agreement was amended several times to address administerial issues, such as completion timing of facilities and changes in sources of funds. The eighth amendment, dated January 28, 2015, materially changed the DYY Program by altering the participating entities' performance criteria via the adoption of a revised Exhibit G, now named "Chino Basin Conjunctive Use Program (CUP) 'Dry Year' Storage Project Performance Criteria," and increasing the baseline purchase from Metropolitan to the region to 40,000 AF of water. According to Exhibit G, performance is determined by using an operating party's groundwater baseline. The eighth

11

amendment was adopted after formal notice was provided, the proposal was vetted and approved by the pool committees, the advisory committee, and Watermaster, and a technical analysis confirmed the amendment would not cause material physical injury to the Basin.

G. *2019 Letter Agreement.*

In 2017, Metropolitan had excess water from the State Water Project that it needed to store. After obtaining authorization, Metropolitan recharged around 41,380 AF of water into the DYY Program storage account from June 2017 to June 2018. This increase in stored water prompted the Operating Committee to explore the potential of allowing voluntary withdrawal of water, as opposed to mandatory withdrawal via a Metropolitan call. The proposed system of voluntary withdrawals "was deemed not to materially affect the rights of the [DYY Program] parties and local agencies." Thus, in 2018, IEUA proposed revising the DYY Program, "to increase flexibility for the parties in the Chino Basin by allowing the region to choose when to buy-out the DYY account [(voluntary take)] without waiting for [a Metropolitan] 'call year' [(mandatory take)]."

Ontario raised questions regarding whether these voluntary withdrawals from the DYY Program storage account under the proposed system would be subject to Watermaster assessments as typical production from the Basin, or whether the proposed voluntary withdrawals would be exempt from Watermaster assessment as part of the storage and recovery program. Ontario opined that if the voluntary withdrawal system would materially affect the DYY Program, the proper implementation mechanism would be a formal amendment to the program documents. IEUA replied, "Based on

12

conversations with [Watermaster], the DYY water is a storage and recovery program, and is not subject to assessments."  Following subsequent discussions, Ontario stated, "Based on the information provided by IEUA, [Ontario is] currently neutral regarding the proposed letter agreement between IEUA and [Metropolitan].  As long as there are parameters that are undecided or unclear, Ontario cannot take a position of support because we cannot know the full effects of the proposed changes.  Without these details, which would best be explained and memorialized in an amendment, we will take a wait-and-see approach regarding impacts, and we reserve the right to address any harm or detriment that may arise."

At the Ap Pool's meeting on September 13, 2018, Watermaster's General Manager (Peter Kavounas) noted that "some proposed changes" to the DYY Program had been circulated, and he planned to sign it "on behalf of Watermaster" but "the changes don't commit Watermaster to - - to anything.  We actually don't think a letter is even required.  It's just [Metropolitan] offering its water at better terms to the parties, which they're entitled to do.  So if there is a letter, we do plan to sign it."  He added, "It's a good thing.  Again, it doesn't affect Watermaster, but we are signatories to the original DYY.  So if they want us to sign a letter of acknowledgement, I will go ahead and do that."  At the Watermaster Board meeting on September 27, 2018, Mr. Kavounas informed the Board about Metropolitan's proposed changes to the DYY Program, and he characterized them as "favorable to the parties."  He added, "We don't believe they constitute a change to the agreement, so we don't intend to bring an agreement

13

amendment to the board. There may be an acknowledgement letter. If there is, I wanted to let you know that I would be signing that acknowledgement letter."

In February 2019, Mr. Kavounas executed the 2019 Letter Agreement between Watermaster, Metropolitan, IEUA, and TVMWD. According to this agreement, any water stored after June 1, 2017 "would be purchased from the account by IEUA and [TVMWD] when the parties pump over the groundwater baseline as defined in Exhibit G. . . . This pumping could be the result of a response to a call for pumping made by Metropolitan or it could be through normal operational decisions made by the individual parties in a given year. Except during a call, the increase in pumping would be voluntary and performance would be measured by the parties that elect to increase their pumping. Call provisions would remain unchanged. The parties will receive O&M, power and treatment credits and be billed for the water when the parties pump over the groundwater baseline as defined in Exhibit G."

Initially, the DYY Program allowed Metropolitan to "call on Parties to take stored water in lieu of [Metropolitan] deliveries and receive an operational credit, or the Parties may do so voluntarily without receiving the operational credit." Either way, the parties "pay [Metropolitan] for the water as if they were receiving ordinary [Metropolitan] deliveries." However, the 2019 Letter Agreement allowed the parties "to voluntarily take water and receive an operational credit without a [Metropolitan] call" when they "pump over the groundwater baseline as defined in Exhibit G."

14

*H. Impacts of the 2019 Letter Agreement.*

As previously noted, all water produced in the Basin was assessed consistent with the terms of the Judgement and Watermaster Rules and Regulations; each party's assessment was based on the amount of its individual production.[8] However, following the 2019 Letter Agreement, Watermaster interpreted it to allow parties to produce (take) extra stored groundwater from the DYY Program storage account without realizing a corresponding change or reduction in the production of imported surface water. Thus, in calculating the FY 2021/22 assessment package, Watermaster exempted CVWD's voluntary production of 20,500 AF of water from the DYY account even though the agreed-to performance criteria authorized it to produce only 11,353 AF in any given year. Also, for the first time, FWC—a member of the Ap Pool, a customer of IEUA, and an

---

[8] Watermaster filed a request for judicial notice with its respondent's brief. We reserved ruling for consideration with the merits of the appeal, Having now considered the request, we deny it. The request seeks judicial notice of Metropolitan Resolution 9265—which adopted updates to Metropolitan's wholesale water rates and charges, including its full service volumetric rates—on the grounds the Metropolitan's wholesale water rates relate to the cost of water voluntarily withdrawn from the DYY Program storage account. In response, Ontario contends the request should be denied because Watermaster never presented this document to the superior court, and it is irrelevant to the issues currently before this court. We agree with Ontario and deny the request for judicial notice. "Reviewing courts generally do not take judicial notice of evidence not presented to the trial court." (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.) In exceptional circumstances, we may, but are not required to, take judicial notice of material that was not presented to the lower court in the first instance. (*Ibid*.; see *Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 325.) Watermaster has not presented any exceptional circumstances. We therefore follow the general rule and decline to exercise our discretion to take judicial notice of this evidence. Also, the evidence is unnecessary to our resolution of this appeal. (*County of San Diego v. State of California* (2008) 164 Cal.App.4th 580, 613, fn. 29 ["materials in question are unnecessary to resolution of the appeal"].)

15

entity not governed by a Local Agency Agreement—voluntarily produced and claimed 2,500 AF of stored groundwater from the DYY account. Watermaster exempted this voluntary production from FWC's FY 2021/22 assessment.

Similarly, Watermaster's interpretation of the 2019 Letter Agreement affected calculation of the FY 2022/23 assessment package. For example, CVWD shifted off of imported water by 13,915 AF but claimed DYY production of 17,912 AF (4,000 AF more). FWC shifted off of imported water by 1,718 AF but claimed DYY production of 5,000 AF (3,282 AF more). The shift off of imported water is fundamental to the DYY conjunctive use program, and it is mandatory under the terms of the court orders approving the DYY Program, which adopt Exhibit G performance criteria.

*I. Ontario's Challenge.*

In response to Watermaster's proposed FY 2021/2022 Assessment Package, on November 1, 2021, Ontario requested an explanation for the exemption of 23,000 AF of groundwater produced from the DYY Program. Ontario claimed such exemption was inconsistent with the Judgment which required its assessment. On November 18, 2021, Watermaster Board directed its staff and legal counsel to evaluate Ontario's concerns. Nonetheless, that same day, Watermaster Board approved the FY 2021/2022 Assessment Package; its staff noted that, if warranted, the assessment package could always be changed retroactively. Subsequently, discussions continued regarding Ontario's concerns. Monte Vista Water District also expressed its concerns related to unrestricted voluntary takes and their impacts on assessments to Watermaster. Watermaster Board

16

directed staff to consult with the parties, prepare a summary of the issue, and make any pertinent recommendations.

In preparing its January 27, 2022, report, Watermaster staff noted Ontario asked that Watermaster cease any further implementation of the 2019 Letter Agreement and amend the assessment packages as applicable, and Monte Vista Water District recommended the provisions of the 2019 Letter Agreement be set aside and "clear and consistent criteria [be established] for how DYY [Program] production should be assessed by Watermaster."  The staff opined that Ontario's concerns "appear to be predominantly:  (i) the precedent of how aspects of the [DYY] Program's administration are adjusted and (ii) the specific financial consequences resulting from [Metropolitan's], IEUA's, TVMWD's and Watermaster's willingness to extend the recovery of imported water stored in the Basin from dry years to all years for the remainder of the Program."

When the Watermaster Board discussed Ontario's concerns on January 27, 2022, it concluded the following:  (1) Watermaster cannot set aside the 2019 Letter Agreement because the Operating Committee implements operation of the DYY Program according to the contract provisions, including the 2019 Letter Agreement; (2) Ontario's complaint concerns the effects of the 2019 Letter Agreement; (3) Monte Vista Water District now concludes the 2019 Letter Agreement was not the appropriate vehicle even though Monte Vista Water District was an integral part in its development; (4) the parties may agree to a different forward implementation of the DYY Program under existing terms and conditions including the 2019 Letter Agreement, and instruct Watermaster accordingly; and (5) the four signatories to the DYY Program (Metropolitan, IEUA, TVMWD, and

17

Watermaster) may formally modify it, and Watermaster may propose such modification to the Operating Committee. Watermaster staff recommended the parties "could reach agreement on forward implementation of the DYY Program under existing terms and conditions; or, [¶] [they] could recommend, upon reaching consensus, one or more DYY modifications to IEUA, its Member Agencies, and Watermaster to consider and propose to the Operating Committee, leading to a DYY contract modification."

When no resolution was reached by February 17, 2022, Ontario filed an application in the superior court for an order to extend the time under paragraph 31(c) of the Judgment, from 90 days to 180 days, to challenge Watermaster's November 18, 2021, decision approving the FY 2021/2022 Assessment Package, or if such request is denied, to consider this application to be the challenge. Watermaster, IEUA, FWC, and CVWD opposed Ontario's application. On November 3, 2022, the court concluded Ontario's challenge to the FY 2021/2022 Assessment Package was really a challenge to the validity of the 2019 Letter Agreement and denied it as untimely. Ontario appealed.

When Watermaster approved the FY 2022/2023 Assessment Package on November 17, 2022, Ontario again filed a motion in the superior court challenging the failure to levy assessments on water voluntarily produced from the DYY Program. Watermaster, IEUA, FWC and CVWD opposed the motion. On August 21, 2023, the court denied the motion on the grounds Ontario's position regarding the validity of the 2019 Letter Agreement was previously rejected, the Judgment does not require assessment of stored or supplemental water, and Ontario misconstrues the language in the 2019 Letter Agreement because Exhibit G's performance criteria do not apply to

18

voluntary withdrawals. Ontario appealed. We consolidated the two appeals for purposes of briefing, oral argument, and decision.

## II. DISCUSSION

Ontario challenges the superior court's rulings that Watermaster was not required to levy assessments on groundwater produced as part of the DYY Program. It contends (1) Watermaster's failure to assess water produced from the DYY Program storage account is inconsistent with the Judgment and subsequent court orders; (2) Watermaster violated the Judgment by allowing a nonparty (FWC), without a written storage agreement, to withdraw stored groundwater through the DYY Program; (3) the 2019 Letter Agreement made unauthorized changes to the DYY Program without providing notice or following the required approval process; (4) Ontario's challenge is timely; (5) the superior court erred in holding that all stored and supplemental water in the Basin is categorically exempt from assessment; and (6) Watermaster erred in failing to apply the Exhibit G performance criteria when interpreting the 2019 Letter Agreement.

As we explain, we conclude Ontario's challenge is timely and the 2019 Letter Agreement was incorrectly interpreted at best, or imprudently executed at worst.

A. *Timeliness of Ontario's Challenge.*

We begin by considering the issue of timeliness. According to the superior court's ruling, Ontario's challenge to Watermaster's approval of the FY 2021/2022 and 2022/2023 Assessment Packages are thinly veiled challenges to Watermaster's execution of the 2019 Letter Agreement and, as such, they are untimely because the 2019 Letter Agreement was provided to all parties on or around March 20, 2019. The court explained

19

that "under Paragraph 31(c) of the Judgment, *Ontario had 90 days to serve and file notice of any motion or application seeking review of Watermaster's action in executing the 2019 Letter Agreement*." Thus, according to the court, Ontario had until June 18, 2019, to challenge Watermaster's execution of the 2019 Letter Agreement.

On appeal, Ontario contends it is not challenging the 2019 Letter Agreement. Rather, it is challenging Watermaster's interpretation of the letter which (1) "made fundamental changes to the DYY Program, including by allowing parties to flout the DYY Storage Agreement by 'voluntarily' producing far more stored groundwater from the DYY account than the Exhibit G performance criteria allowed," and by exempting such production from assessment; and (2) harmed Ontario when applied to both the FY 2021/2022 and 2022/2023 Assessment Packages. Thus, Ontario argues that its challenges are timely. (*Travis v. County of Santa Cruz* (2004) 33 Cal.4th 757, 769 (*Travis*).) Moreover, Ontario asserts the 90-day period in which a party must file a notice or application seeking review of an action like the 2019 Letter Agreement never accrued because Watermaster failed to provide formal notice of its approval of the letter pursuant to paragraph 31 of the Judgment. Alternatively, Ontario argues that its challenges are "akin to a challenge to an unlawful tax" because the 2019 Letter Agreement imposes a continuing or recurring obligation. (*Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 812.) Respondents Watermaster, IEUA, and CVWD refute each of these contentions and argue the challenges are barred by laches. We conclude Ontario's challenges to both FY 2021/2022 and 2022/2023 Assessment Packages, filed within 90 days of Watermaster's action approving them, are timely.

20

Citing *Travis*, Ontario argues it was Watermaster's application of the 2019 Letter Agreement in the FY 2021/2022 and 2022/2023 Assessment Packages, including the new benefit given to FWC, that harmed Ontario and is the basis for its challenge. We agree. At issue in *Travis* was a statute whose 90-day limitations period was triggered differently depending on whether the challenge was to enactment of an ordinance or to imposition of conditions under the ordinance. (*Travis*, *supra*, 33 Cal.4th at p. 768; see *County of Sonoma v. Superior Court* (2010) 190 Cal.App.4th 1312, 1324.) *Travis* involved two property owners' challenge to a county ordinance they alleged violated state law, was preempted by state and federal law, and unconstitutionally took their property without compensation by imposing occupancy and rent restrictions as permit conditions. (*Travis*, at pp. 762, 764.) Both the trial and appellate court found plaintiffs' claims were time-barred; however, the California Supreme Court disagreed. (*Id*. at pp. 765-766.) The high court explained that since one of the property owners had complained of injury both from imposition of the permit conditions and the ordinance's enactment, the action was in part timely under Government Code section 65009, subdivision (c)(1)(E), which governs actions to "'determine the . . . validity'" of permit conditions and to "'void, or annul'" those decisions. (*Travis*, at pp. 766-767.) According to the court, "[t]his is not a case in which the plaintiff complains of injury *solely* from a law's enactment. . . . [Rather,] Travis complains of injury arising from, and seeks relief from . . . the County's imposition on his second unit permit of conditions required by the [o]rdinance. Having brought his action in a timely way after application of the [o]rdinance to him, Travis may

21

raise in that action a facial attack on the [o]rdinance's validity. [Citation.]" (*Id*. at pp. 768-769.)

Here, the 2019 Letter Agreement was approved in 2019; however, its effects were unclear until Watermaster interpreted it as (1) authorizing a credit for voluntary DYY Program water takes (regardless of Exhibit G's performance criteria) in calculating assessments, and (2) allowing nonparties to the Funding Agreement to participate. Following the adoption of the FY 2021/2022 and FY 2022/2023 Assessment Packages, Ontario became aware of how Watermaster would interpret and apply the 2019 Letter Agreement and challenged this interpretation and application via challenging the Assessment Packages. Ontario is not claiming injury solely from the approval of the 2019 Letter Agreement. Rather, it complains of injury arising from, and seeks relief from, Watermaster's exemption of certain groundwater produced from the DYY storage account in administering assessments inconsistent with the governing Judgment, prior agreements, and court orders. The exemption of such production is not based on the Judgment or other agreements governing Basin operations and the DYY Program, but upon Watermaster's interpretation of the 2019 Letter Agreement. Having timely challenged Watermaster's approval of the FY 2021/2022 and 2022/2023 Assessment Packages (which reflect Watermaster's imposition of the 2019 Letter Agreement), Ontario may raise an attack on the 2019 Letter Agreement as interpreted and applied.

Nonetheless, Watermaster faults Ontario for not raising this challenge to the FY 2020/2021 Assessment Package which shows a "purported 'waiver' of assessments for voluntary takes when voluntary takes occurring during production year 2019/2020

were not assessed in the 2020/2021 Assessment Package, approved by the Watermaster Board on November 19, 2020." In response, Ontario asserts that, under *Howard Jarvis Taxpayers Assn. v. City of La Habra*, *supra*, 25 Cal.4th at pages 818-825, "a new limitation period begins anew with each unlawful assessment package collected by Watermaster, as does a challenge to the 2019 Letter Agreement. . . . Thus, Ontario had no need to act sooner and any delay in challenging the 2019 Letter Agreement was not 'unreasonable and inexcus[]able.'" Again, we agree.

"[I]n *Howard Jarvis Taxpayers Assn. v. City of La Habra*, *supra*, 25 Cal.4th 809, the plaintiffs belatedly challenged the validity of a municipal tax. Though the limitations period had run on any direct challenge to the validity of the ordinance imposing the tax, [the California Supreme Court] concluded suit was still permissible because the continuing monthly collection of the tax represented an alleged ongoing breach of state law. [Citations.]" (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1199.) Here, Ontario has raised the issue of whether the continuing exemption of voluntary production of DYY Program water from Watermaster's annual assessment (according to Watermaster's interpretation and application of the 2019 Letter Agreement) represents an ongoing breach of the Judgment and other agreements governing Basin operations. As Ontario observes, whether it "should have known . . . about Watermaster's failure to assess stored water as part of the [FY] 2020/2021 Assessment Package is irrelevant."

23

*B.  The Exemption of Voluntary Production of DYY Program Water from Watermaster's Annual Assessment.*

According to Ontario, this case boils down to whether Watermaster should be bound by the terms of the Judgment and several court orders or by its staff's unilateral decisions that have million-dollar consequences for certain parties to the Judgment. Ontario argues "Watermaster's decision to exempt from assessment stored groundwater produced from the DYY account cannot be squared with the express language of the Judgment and other agreements governing Basin operations, nor with Watermaster's own practice of assessing all water produced before 2019[ because t]he effect of [this] decision has been to allow some players in the Basin—notably CVWD and FWC—to circumvent their financial responsibilities while requiring Ontario and others to make up the difference."  Respondents disagree, claiming Ontario incorrectly conflates the production of supplemental water in storage with the production of native groundwater, and DYY Program withdrawals have historically been exempt from assessments.  IEUA further asserts that FWC was not obligated to have a local agency agreement to voluntarily take water, and the 2019 Letter Agreement suspended the Exhibit G performance criteria on voluntary withdrawals apart from utilizing the same baseline measure for production.

*1.  Standard of Review.*

Since the primary issue before this court involves the 2019 Letter Agreement, and other agreements governing Basin operations, we exercise our independent judgment and

apply de novo review. (*Dow v. Honey Lake Valley Resource Conservation Dist*. (2021) 63 Cal.App.5th 901, 911.)

  *2. Analysis.*

  Although the parties have raised issues regarding (1) whether water from the DYY Program is withdrawn (not produced), (2) whether stored and supplemental water are simply two types of ground water, and (3) whether all stored and supplemental water in the Basin is categorically exempt from assessment, we need not resolve these issues today because we conclude that Watermaster erred in its interpretation and application of the 2019 Letter Agreement. As to the other issues raised, we leave them in the hands of the parties, who are much better suited than the superior and appellate courts to decide. While our reversal of the superior court's orders includes a reversal of the lower court's determination of these issues, we express no opinion on them, preferring to allow the parties to resolve them prior to judicial intervention, as they have done in the past. Thus, our focus is on the interpretation and application of the 2019 Letter Agreement.

  As previously noted, the DYY Program is a conjunctive use program specifically designed to maximize the flexibility and reliability of water supplies, including the replacement of imported water with stored groundwater during dry years. The program is governed by three sets of agreements (two of which were approved by the superior court): (1) the Funding Agreement, (2) the Storage and Recovery Agreement, and (3) the Local Agency Agreements. Watermaster oversees the program by virtue of the Storage and Recovery Agreement and its seat on the Operating Committee. As the superior court's 2004 order emphasized, the DYY Program was designed to "provide broad

25

mutual benefits to the parties to the Judgment," and the Judgement prohibits Watermaster from approving any Annual Operating Plan that "will have a substantial adverse impact on producers."

At its inception, the DYY Program authorized Metropolitan (1) to place up to 25,000 AF of water per year[9] into storage in wet years, and (2) in dry years, to require parties with local agency agreements (Chino, Chino Hills, Ontario, Pomona, Upland, CVWD, Jurupa Community Services District, and Monte Vista Water District) to produce 33,000 AF of groundwater from the storage account (pursuant to Performance Criteria) while simultaneously requiring these parties to forgo using an equivalent amount of imported water. The Performance Criteria (Exhibit G attached to the Funding Agreement and revised in 2015) effectuates the goal of the DYY Program, which is to provide a balance between the reduction of imported surface water deliveries and the corresponding increase in the production of stored groundwater.

Moreover, the foundation of the DYY Program is the Local Agency Agreements which define each agency's facilities and annual recovery capacity, including performance targets (reducing their use of imported water deliveries and extracting an equivalent amount of DYY Program water) "to which that local agency has committed itself in exchange for its share of the benefits available under the [2003] Funding Agreement." As the superior court stated in 2003, "[I]t is clear that until Watermaster and this Court approve the Local Agency Agreements and Storage and Recovery

_____

[9] Unless Watermaster approves a greater rate (100,000 AF max).

26

Application, or some equivalent approval process is completed, the storage and recovery program cannot be undertaken." The court's order approving the Funding Agreement indicates that "the specific location and operation of the facilities necessary to accomplish this commitment must . . . be analyzed by Watermaster," and approval "will take the form of Watermaster approval of the Local Agency Agreements."

For nearly two decades, the DYY Program accomplished its goals without any issues. However, in June 2017, Metropolitan began storing excess water (41,380 AF in one year) in the DYY Program storage account. This excess stored water prompted the Operating Committee (five members consisting of two representatives from Metropolitan and three representatives chosen by IEUA, TVMWD, and Watermaster[10]) to propose voluntary withdrawals, as opposed to Metropolitan calls. This proposed system of voluntary withdrawals "was deemed not to materially affect the rights of the [DYY Program] parties and local agencies." Thus IEUA suggested revising the DYY Program, "to increase flexibility for the parties in the Chino Basin by allowing the region to choose when to buy-out the DYY account [(voluntary take)] without waiting for [a Metropolitan] 'call year' [(mandatory take)]." The revision came in the form of the 2019 Letter Agreement.

Watermaster does not dispute that the 2019 Letter Agreement operationally changed the DYY Program to broaden participation and increase the potential for the

---

[10] Metropolitan has two appointees and two of its member agencies on the five-member Operating Committee, giving it considerable influence; yet it is not a party to this litigation.

storage and recovery of imported water. Mr. Kavounas, Watermaster's General Manager, characterized this change as "favorable to the parties," and claimed that it will not "affect Watermaster." However, that was not the case. As a result of the 2019 Letter Agreement, two agencies (CVWD and FWC—a party not subject to the Performance Criteria in Exhibit G) voluntarily withdrew water from the DYY Program storage account during FY 2020/2021 and 2021/2022. Subsequently, when calculating annual assessments, Watermaster ignored the absence of a Local Agency Agreement (FWC) and the performance criteria set forth in Exhibit G (CVWD) and exempted these takes. These exemptions decreased CVWD's and FWC's assessments, while increasing the assessments of other parties, such as Ontario. Nonetheless, Watermaster maintains that this change in the allocation of assessments among the parties is not relevant because it has no effect on the health of the Basin.

In challenging Watermaster's approval of the FY 2021/2022 and 2022/2023 Assessment Packages, Ontario contends Watermaster's interpretation and application of the 2019 Letter Agreement violated the Judgment and the agreements that created the DYY Program. We agree.

It bears repeating that the DYY Program's goal is to provide greater water supply reliability by storing water in advance of dry periods and pumping the stored water in lieu of receiving imported water during droughts. To that end, the program's agreements involved eight entities with water storage facilities: Chino, Chino Hills, Ontario, Pomona, Upland, CVWD, Jurupa Community Services District, and Monte Vista Water

28

District (collectively referred to as Operating Parties).[11]  Specific performance criteria set forth in Exhibit G dictated the amount of water Metropolitan could require these Operating Parties to produce in lieu of imported water.  In 2015, an Amendment No. 8 to the Funding Agreement materially changed the program by altering the Operating Parties' performance criteria.  This amendment was adopted after formal notice was afforded to the parties, and the proposed change was vetted (via a technical analysis) and approved by the pool committees, the advisory committee, and Watermaster.

When the idea of revising the DYY Program to include voluntary takes was introduced, IEUA initiated discussion with the Operating Parties.  Recognizing the proposed change was a material departure from the program's initial goal, Ontario took a neutral position and refused to support the change "[a]s long as there are parameters that are undecided or unclear . . . because we cannot know the full effects of the proposed changes."  Recommending the change be "explained and memorialized in an amendment," Ontario reserved "the right to address any harm or detriment that may arise" based on possible "impacts."

---

[11]  The Funding Agreement states that "[t]he proposed groundwater storage Program consists of the facilities described in Exhibit H (the '**Facilities**').  The agencies within the service areas of IEUA and TVMWD responsible for operating the respective Facilities ('**Operating Parties**') are . . . listed in Exhibit H.  IEUA and TVMWD will enter into agreements with **Operating Parties** within their respective service areas that will require such **Operating Parties** to operate and maintain the Facilities."  The Operating Parties listed in Exhibit H include Pomona, Monte Vista Water District Chino, Upland, Chino Hills, CVWD, Ontario, FWC, and Jurupa Community Services District; however, FWC never opted in as an Operating Party.

Despite Ontario's concerns and recommendations, Metropolitan prepared the 2019 Letter Agreement wherein it acknowledged the storage of 39,000 AF of water, and expressed appreciation for the "effort that *the parties* have shown to maximize storage during [FY 2017/2018]." According to the letter, "*the parties*" agreed that water stored after June 1, 2017, "would be purchased from the account by IEUA and [TVMWD] *when the parties pump over the groundwater baseline as defined in Exhibit G*." Exhibit G was included with the letter. Metropolitan further stated that this pumping "could be the result of a response to a call" by Metropolitan or "through normal operational decisions made by the individual *parties* in a given year. Except during a call; the increase in pumping would be voluntary and performance would be measured by the *parties* that elect to increase their pumping. Call provisions would remain unchanged. The *parties* will receive O&M, power, and treatment credits and be billed for the water when the parties pump over the groundwater baseline as defined in Exhibit G."

As Ontario points out, the effect of the 2019 Letter Agreement (as interpreted and applied by Watermaster) was to "defy the rules set forth in the documents that establish and govern the operation of the DYY Program, including the 2003 Funding Agreement, the 2003 court order adopting it, and the DYY Storage Agreement and its associated court order" by allowing FWC (a nonparty) to voluntarily produce water from the program storage account without a Local Agency Agreement, by letting CVWD to voluntarily produce double its allocated shares of stored water regardless of its performance criteria, and by permitting these voluntary extractions without any corresponding reductions in imported water. We agree.

30

To begin with, in the order approving the Storage and Recovery Agreement for the DYY Program, the superior court recognized that "[t]he Judgment enjoins storage or withdrawal of stored water 'except pursuant to the terms of a written agreement with Watermaster . . . [that] is [in] accordance with Watermaster regulations.' . . . The Court must first approve, by written order, the Watermaster's execution of 'Ground Water Storage Agreements.'" FWC does not have such agreement. Nonetheless, respondents contend that FWC was not obligated to have a Local Agency Agreement for voluntary withdrawal because additional facilities and performance standards were not involved, and there is nothing in the Funding Agreement or Local Agency Agreements that restrict the withdrawal of DYY Program water to parties with Local Agency Agreements. Watermaster further asserts there is no violation of the Judgment because the Storage and Recovery Agreement for the DYY Program satisfies paragraph 28 of the Judgement, and FWC is not the storing party; rather, Metropolitan owns the water in the DYY Program storage account, and IEUA acts as the manager of the account. According to Watermaster, (1) the Local Agency Agreements were required to enforce the "performance targets to which [each Operating Party] has committed itself in exchange for its share of the [capital] benefits available under the [2003] Funding Agreement;" and (2) since FWC received no capital benefits from Metropolitan, it had no performance obligations (as set forth in Exhibit G), and nothing in the DYY Program agreements suggests that a Local Agency Agreement is required for a voluntary withdrawal because the language is limited to Exhibit G's application to Metropolitan calls only. We are not persuaded by respondents' argument.

None of the three sets of DYY Program agreements considered a situation where the Operating Parties, or nonparties to the program, would be allowed to produce water from the program's storage account absent a court-approved written agreement with Watermaster. To hold otherwise ignores the Judgment, the DYY Program agreements, the conduct of all entities involved in the DYY Program, and the superior court's order approving the program. By using the absence of voluntary withdrawal language to justify their position, respondents seek to have their cake and eat it too. This is not permitted. "In the interpretation of contracts, the paramount consideration is the intention of the contracting parties '. . . as it existed at the time of contracting, so far as the same is ascertainable and lawful.' [Citations.] . . . [¶] The words used in a contract must be given their ordinary meaning, unless there is evidence that the parties intended to use them in a unique sense or to give the words some different meaning. [Citations.] If a contract is reasonably susceptible to more than one interpretation or if it contains latent or patent ambiguities, the court may use extrinsic evidence to clarify the uncertainties; extrinsic evidence is relevant and material to prove a meaning to which the language of an instrument is reasonably susceptible. [Citations.] [¶] In construing a contract, it is not a court's prerogative to alter it, to rewrite its clear terms, or to make a new contract for the parties. [Citations.] Courts will not add a term to a contract about which the agreement is silent. [Citations.]" (*Moss Dev. Co. v. Geary* (1974) 41 Cal.App.3d 1, 9.)

As IEUA acknowledges, DYY Program water is stored pursuant to the Storage and Recovery Agreement between Watermaster, IEUA, and TVMWD. Withdrawals are governed by the Funding Agreement, which sets the terms and conditions under which

32

water can be stored within the Basin and later called for production by Metropolitan. The Funding Agreement identifies the agencies within IEUA's and TVMWD's service areas as Operating Parties, lists the Operating Parties in Exhibit H (Pomona, Monte Vista Water District, Chino, Upland, Chino Hills, CVWD, Ontario, and Jurupa Community Services District[12]), establishes the performance criteria for each Operating Party, and states that IEUA and TVMWD will enter into separate agreements with every one of them. Additionally, the Local Agency Agreements specify the amount of grant funds which would be passed through from IEUA to the Operating Parties for the purpose of constructing infrastructure to produce DYY Program water. If FWC was not obligated to have a Local Agency Agreement because it was not a storing party, i.e., it received no capital benefits from Metropolitan and had no performance obligations (as set forth in Exhibit G), then why does the Funding Agreement reference and identify Operating Parties? Why does the Storage and Recovery Agreement state that "no person shall store water in, and recover water from the Chino Groundwater Basin through the Storage and Recovery Program, without a Storage and Recovery agreement with Watermaster?" Why are the Operating Parties required to enter into Local Agency Agreements? Why does the 2019 Letter Agreement include Metropolitan's appreciation for the "effort that *the parties* have shown to maximize storage during [FY 2017/2018]?" Who are the parties Metropolitan was referring to if not the Operating Parties identified in Exhibit H to the Funding Agreement? Contrary to respondents' claims, the agreements (including the

---

[12] Again, FWC never opted in as an Operating Party.

33

2019 Letter Agreement) that govern the DYY Program do not apply to entities that do not have a Local Agency Agreement.

Moreover, as Ontario points out, Local Agency Agreements "are storage *and recovery* agreements that detail the means by which DYY [Program] water is recovered, including the [Operating Party's] specific responsibilities relating to the pumping of stored water." Thus, water can no more be recovered (produced/withdrawn) without a Local Agency Agreement than it can be stored without such agreements. Nor can the Exhibit G performance criteria be suspended (for any production, voluntary or not) without compromising the integrity of the DYY Program. In other words, to allow the voluntary withdrawal of stored water, and in amounts greater than that permitted under the Exhibit G performance criteria, would create an imbalance between the use of imported surface water and stored water which the program had established. Yet, that is what was done by allowing CVWD to voluntarily produce double its allocated shares of stored water regardless of its performance criteria and without a corresponding reduction in imported water.

IEUA dismisses the voluntary productions as merely "operational changes" to the DYY Program, contending the 2019 Letter Agreement was "within the operational flexibility afforded the Operating Committee in the [2003] Funding Agreement to adapt to changed circumstances." Not so. Operational changes are allowed, but only if they do

not materially affect the rights of the DYY Program parties and local agencies.[13]  Such was not the case here since an Operating Party (CVWD) has voluntarily produced double its allocated shares of stored water from the DYY Program storage account, a nonparty has voluntarily produced stored water from the DYY Program storage account, Watermaster has exempted these voluntary productions from assessment, and Ontario's rights were materially affected when its assessments for both FY 2021/2022 and 2022/2023 increased due to the exemption of voluntary production of water from the DYY Program storage account.  In other words, Ontario suffered a financial injury as a result of the 2019 Letter Agreement.

Watermaster takes issue with our conclusion that Ontario's financial injury constitutes a significant adverse impact.  It argues that this term is found in the Judgment only and originated in 1970 with the enactment of the California Environmental Quality Act.  Subsequently, during the negotiation of the Peace Agreement, the term material physical injury was added and defined as any "material injury that is attributable to the Recharge, Transfer, storage and recovery, management, movement or Production of water, or implementation of the OBMP, including, but not limited to, degradation of water quality, liquefaction, land subsidence, increases in pump lift (lower water levels) and adverse impacts associated with rising groundwater."  It specifically exempted any

---

[13]  Section 5.2(c)(iv)(b) of the Peace Agreement states that Watermaster is to give first priority to storage and recovery programs that provide broad mutual benefits to the parties to the Judgment.

"economic injury." Thus, Watermaster argues Ontario's financial injuries, which are solely economic injuries, are not redressable. We disagree.

Use of the term substantial adverse impact is not limited to the Judgment. It was used in the superior court's 2003 order approving the Funding Agreement, Watermaster's motion for approval of the Storage and Recovery Agreement, the Storage and Recovery Agreement, the 2004 order approving the Storage and Recovery Agreement, and the court's May 12, 2023, tentative ruling. In 2003, when the Funding Agreement was approved, the court acknowledged the Judgment's requirement that "groundwater storage agreements are to contain terms that will preclude operations having a *substantial adverse impact* on other producers."

When Watermaster moved for approval of the Storage and Recovery Agreement, it also acknowledged the Judgment's requirement that "all storage agreements shall by their terms preclude operations which will have a *substantial adverse impact* on other Producers." Watermaster noted that "[t]his requirement is similar to the requirement contained in the Peace Agreement and Watermaster's Rules and Regulations that Watermaster ensure that no Material Physical Injury is caused to any party or the Basin. Thus, through Part III of the Agreement,[14] Watermaster references the broad requirement that the *storage of water under the Agreement must not cause either*

---

**14** Section III. of the Storage and Recovery Agreement, entitled "No Material Physical Injury" states: "The Storage and Recovery of Supplemental Water stored under this Agreement will not cause *Material Physical Injury* **or** a *substantial adverse impact* to any party to the 1978 Judgment or to the Basin itself."
"Or" is "used as a function word to indicate an alternative." (https://www.merriam-webster.com/dictionary/or, as of April 17, 2025.)

*Material Physical Injury or a substantial adverse impact to any party or to the Basin.*"  If substantial adverse impact is similar to material physical injury, then why use both terms?  Why was the term material physical injury defined, but substantial adverse impact was not?

The 2004 order approving the Storage and Recovery Agreement acknowledges the Judgment's provision in paragraph 28 that "agreements for storage . . . must include terms that will 'preclude operations which will have a *substantial adverse impact* on other producers.'"  It further provides, "The DYY Storage Agreement calls for the development of Annual Operating Plans, which will provide estimated schedules and locations for the delivery of all water into and out of storage, on a monthly basis, for the upcoming fiscal year.  The Annual Operating Plan is to be submitted to Watermaster for approval and is to have sufficient detail to allow Watermaster to assess the potential for any adverse impacts on producers.  *Pursuant to Judgment paragraph 28, Watermaster may not approve an Annual Operating Plan that will have a substantial adverse impact on producers*."  And the superior court's tentative ruling for May 12, 2023, reiterated its prior orders' (2003 and 2004) acknowledgment that "*groundwater storage agreements are to contain terms that will preclude operations having a substantial adverse impact on other producers*."

Given the use of the conjunctive "or" when referencing both substantial adverse impact and material physical injury, we conclude the two terms do not share the same meaning.

Also, the "changed circumstance" that necessitated a modification to the DYY Program was Metropolitan's receipt of excess water (above the amount determined to meet the needs of the program) that needed to be stored. To the extent this excess stored water surpassed the limitations initially imposed by the DYY Program agreements, the Operating Committee[15] should have proposed an amendment to the Funding Agreement, similar to Amendment No. 8 in 2015. This is especially true given the Operating Committee's decision to expand the DYY Program beyond its originally intended purpose by allowing voluntary takes never contemplated by the program's initial agreements.

3. *Summary.*

To summarize, the DYY Program was created to provide a buffer against drought, allowing Metropolitan to offset water it would otherwise import into the Basin with water stored in the DYY Program storage account. However, in 2018, Metropolitan requested, and was allowed, to put excess water into the DYY Program storage account. It then persuaded the Operating Committee (of which it possessed two votes) to propose the 2019 Letter Agreement. This agreement fundamentally changed the recovery aspect of the DYY Program by allowing voluntary production of water from the storage account regardless of party status or performance criteria. The impact of these voluntary takes materially affected the rights of the Operating Parties and other local agencies when

---

[15] If not the Operating Committee, then Watermaster should have proposed an amendment. The Storage and Recovery Agreement provides that any storage and recovery of supplemental water "shall occur only under Watermaster's control and regulation *in accordance with the Judgment and the Peace Agreement*."

Watermaster interpreted and applied the 2019 Letter Agreement inconsistently with the original DYY Program agreements, the Judgment, and prior court orders when it calculated/approved the FY 2021/2022 and 2022/2023 Assessment Packages. Accordingly, we reverse the orders of the superior court and direct Watermaster to correct and amend the FY 2021/2022 and 2022/2023 Assessment Packages consistent with the original DYY Program agreements, the Judgment, and prior court orders.

## III. DISPOSITION

The November 3, 2022, and August 23, 2023, orders are reversed. The superior court is directed to enter new orders granting Ontario's challenges, and directing Watermaster to correct and amend its FY 2021/2022 and 2022/2023 Assessment Packages. The issues of (1) whether water from the DYY Program is withdrawn (not produced), (2) whether stored and supplemental water are simply two types of ground water, (3) whether all stored and supplemental water in the Basin is categorically exempt from assessment, and (4) the future viability and application of the 2019 Letter Agreement should be resolved by the parties prior to judicial intervention. Ontario shall recover its costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER_____
Acting P. J.

We concur:

MILLER_____
J.
CODRINGTON_____
J.

39